Jeffrey D. Eisenberg (4029)
Eric S. Olson (11939)
**EISENBERG GILCHRIST & CUTT**
215 South State Street, Suite 900
Salt Lake City, Utah 84111
Telephone: (801) 366-9100
Facsimile: (801) 350-0065
Jeisenberg@braytonlaw.com
Eolson@braytonlaw.com

*Attorneys for Plaintiff*s

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH  CENTRAL DIVISION

| | |
|---|---|
| JASON KAUFUSI; QUEST YOUTH SERVICES, LLC, a Utah Limited Liability Company; ROGER G. SEGAL, Chapter 7 Trustee for the Bankruptcy Estate of Jason Kaufusi<br><br>        Plaintiffs,<br><br>v.<br><br>UNITEDAMERICA INSURANCE GROUP, a Pennsylvania corporation, DIAMOND STATE INSURANCE COMPANY, an Indiana corporation; BW INSURANCE AGENCY, INC., a North Dakota corporation; BANK OF THE WEST, a California corporation,<br><br>        Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:11-cv-00108-DAK<br><br>District Judge Dale A. Kimball |

Plaintiffs, by and through counsel, hereby submit this memorandum in support of their

motion for partial summary judgment.  Specifically, Plaintiffs seek summary judgment and an order

(1) declaring that Diamond State Insurance Company breached its contractual duty to defend

Plaintiffs against a tort claim brought by the heirs of Dillon Whitney; and (2) requiring Diamond

State Insurance Company to pay the bankruptcy trustee and Quest $1,900,000, plus statutory interest. This sum will satisfy an arbitration award and subsequent settlement agreement which was entered against Quest after Diamond State abandoned its defense obligations with respect to the claim.

## INTRODUCTION

Quest Youth Services, LLC, ("Quest") provided youth proctor homes to troubled youth via contracts with the State Department of Juvenile Justice Services.  In 2007, Quest and its managing member, Kaufusi, purchased a comprehensive policy of insurance for the business.  Defendant, Diamond State ("DS") insured Quest, Kaufusi and the State of Utah Division of Juvenile Justice Services as an additional insured under this policy.  The policy contains both commercial general liability ("CGL") and professional liability ("PL") coverage.  The PL coverage insures for liability claims founded upon acts that require specialized training or skill and the CGL coverage insures for other negligent acts or omissions[1].  When Quest and Kaufusi were sued for wrongful death and tendered the claim to DS in 2009, DS denied coverage.  Plaintiffs  have retendered the claim to DS several times, including in January 2010 and again in February, 2012.  DS has always responded with denials of the claim.

The Court should grant summary judgement to Plaintiffs because, as a matter of law, DS owed (and still owes) Plaintiffs a defense under the policy.  Plaintiffs have also asserted claims based upon DS' breach of the covenant of good faith and fair dealing and its breach of fiduciary duties; however, these claims are fact dependant and are not addressed by this motion.

---

[1]  In some cases, there can be concurrent coverage under both the PL and CGL coverages.

### Overview and Summary of Argument

In late 2007, Dillon Whitney, a youth then under the custody of Quest, went AWOL from a Quest managed proctor home and was killed at an unsupervised party. In January 2009, Whitney's heirs filed suit for wrongful death against, *inter alia*, Quest, Jason Kaufusi and the State of Utah, Department of Juvenile Justice Services. The suit included allegations that Quest's Member and Manager, Jason Kaufusi, failed to make timely calls to Dillon's parents and to state authorities after being informed that Dillon was AWOL. Quest's insurance agent tendered the claim to DS in April 2009 and requested a defense. DS denied the claim the same day it received the tender.

Due to DS' denial, Jason Kaufusi and Quest were left without legal protection. Unable to pay a defense lawyer to fight the claim through an expensive trial, Quest and Kaufusi began to litigate the Whitney claim. DS was given a second opportunity to step in and defend the claim in January 2010 and was told that if it did not, Quest would likely need to try to settle the claim as it lacked funds to defend on its own. DS again refused to defend.

Since Whitney's heirs, Quest, and Kaufusi disagreed about the value of Whitney's claim, the parties ultimately agreed to submit the claim to an arbitrator with the understanding that the claim would be settled after the arbitrator issued a decision. In October, 2010, arbitrator Barbara Berrett, awarded $1,900,000 to the Whitney plaintiffs. Whitney, then entered into a settlement agreement in December 2010, whereby Quest stipulated to entry of a judgement for $1,900,000 and Whitney agreed to pursue any claim against Kaufusi only by filing a creditor's claim in Kaufusi's pending bankruptcy. On January 7, 2011, a $1,900,000 judgement was entered against Quest in the Whitney federal lawsuit. Whitney's heirs submitted a creditor's claim in Kaufusi's bankruptcy. These claims

are still unsatisfied.

Whitney's claim against the State defendants remains active and pending, as does the State's cross-claim against Quest for contractual indemnity. Quest was obligated to defend the State for the Whitney claim, but DS' refusal to provide defense or coverage has made it impossible for Quest to do so.

When DS denied coverage for the claim, it acknowledged that Quest and Kaufusi were insured under both the PL and CGL coverages in the policy. DS denied the claim under the PL coverage, citing that this was a "claims made" policy and stating that Quest and Kaufusi did not report the claim by the date required in the policy[2]. However, under Utah law, DS cannot enforce the "claims made" condition in the policy to deny coverage for two reasons.

First, the cover page of the DS insurance policy does not contain the necessary "conspicuous" disclosure that the policy is a "claims made" policy. Utah Code Annotated.§31A-22-204 provides as follows: "No insurer may limit coverage under a policy insuring against legal liability to claims that are first made against the insured while the policy is in force, unless the policy contains **on the cover page**, a conspicuous statement that the coverage of the policy is limited in that way." (Emphasis added. ) The cover page of DS's policy contains no disclosure of any sort that the claims made requirement. Absent the claims made defense, DS was and is still obligated to provide defense and indemnity to Quest and Kaufusi.

DS also breached the contract of insurance, when it refused to defend the claim but failed

---

[2] For purposes of this motion only, DS' allegation that they were not advised of the claim until April 2009 is taken as true.

to allege any prejudice resulting from Quest's untimely reporting. Utah Code Annotated §31A-21-312 requires that an insurer must show prejudice due to untimely reporting (*i.e.*, that untimely reporting impaired the ability to defend) before it may deny coverage. DS may claim that it is not required to allege prejudice due to late reporting pursuant to Utah Code Ann. §31A-22-203. However, the DS policy issued to Quest does not fit under the exception statute because it contained an extended reporting feature.

DS also breached its duty to defend Quest and Kaufusi when it denied the tender under the CGL coverage in the policy. DS relied upon the "Endorsement –Excluded Professional Services" contained in the CGL coverage. However, DS was not entitled to deny a defense under the CGL endorsement because the Whitney complaint contained some allegations that did not involved on the failure to render "professional services" as the basis for Quest and Kaufusi's liability.

Specifically, Donna Whitney's complaint alleged that Quest and Kaufusi failed to make timely phone calls to report Dillon Whitney's AWOL status once they learned Dillon was missing and unaccounted for. This allegation triggers coverage because the failure to make phone calls to report a missing person is not a "professional service," as defined by the applicable case law.

Additionally, DS cannot deny a defense because DS failed to define "professional services" in the "excluded professional services" endorsement. DS drafted the policy and chose policy language in the endorsement that results in a narrow construction of the exclusion.

Finally, Plaintiffs request that the Court rule that DS is obligated as a matter of law to pay the judgement entered against Quest in the Whitney action. Under Utah law, when an insurer has wrongfully denied coverage and the insured later settles the claim, the insurer cannot collaterally

attack the settlement unless the settlement is the product of collusion or is entered into in bad faith. Here, Whitney and Quest submitted the claim to an arbitrator to resolve disputes over the value of the claim. The parties then settled the claim in accordance with the arbitrator's findings. There is nothing about this process that suggests collusion or bad faith.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Quest and the Whitney Incident

1.   In 2007, Jason Kaufusi owned and operated Quest. *See* P 317-323[3].

2.   Quest had a contract with the State of Utah under which the State would pay Quest to provide these services. *Id.*

3.   In November, 2007, 16 year-old Dillon Whitney was one of the teens the State had entrusted to Quest. *Id.*

4.   On November 23, 2007, Dillon ran away from the Quest proctor home to which he was assigned. *Id.*

5.   While at the house of a friend or acquaintance, Dillon consumed alcohol, was injured and died two days later. *Id.*

### The Whitney Lawsuit

6.   Dillon's mother sued Quest, Kaufusi and the State for negligence/wrongful death. *See* Amended Complaint - Exhibit B.

7.   Whitney alleged that "[f]or the three days Dillon was missing no one from the State of Utah,

---

[3] All "P" documents cited herein are attached as Exhibit A.

DJJS or Quest reported Dillon missing to any authority who could locate him[.]"  *Id.* at ¶61.

8.      Whitney claimed that Quest was negligent "when it failed to notify the appropriate authorities to locate Dillon."  *Id.* at ¶92.

### Quest's Insurance with DS

9.      A few months before Dillon's death, Quest purchased the subject insurance policy from DS. *See* UAIG 1-110[4].

10.     The policy had one policy number: AGA0002115.  *Id.*

11.     The policy was in effect when Dillon passed away.  *Id.* at UAIG 4.

12.     The State of Utah was an additional insured under the policy.  *Id.* at UAIG 62.

13.     The policy included PL coverage and CGL coverage.  *Id.* at UAIG 3.

### DS' Denial of Coverage

14.     Quest sought coverage for the Whitney lawsuit from DS under the policy.  *Id.* at UAIG 424-431.

15.     DS denied PL coverage, citing to the following exclusion: "This insurance applies to 'claims' first made against the insured in writing during the 'policy period' and reported to us within sixty days after the date of cancellation or expiration of the policy."[5]  *Id.*

16.     The policy defined "claim" to include "reports of accident, errors, occurrences, offenses or omissions which may give rise to a 'claim' under this policy."  *Id.*

17.     In its denial letter, DS stated that this exclusion applied because Quest knew of the Whitney

------

[4] All UAIG documents cited herein are attached in order as Exhibit C.

[5] Hereinafter, this provision is referred to as  "the claims made exclusion."

7

incident during the policy period, but DS did not learn of the incident until more than 60 days after the policy expired.[6]  *See* UAIG 424-431.

18.     DS did not cite to any other basis for denying PL coverage and has not claimed it suffered any actual prejudice due to the late reporting of the claim.  *Id.*; and Deposition of Cheryl Mawby, Volume II, at 123 (all cited portions of this deposition are attached as Exhibit D).

19.     DS also denied coverage under the CGL portion of the policy, citing to the following exclusion: "This insurance does not apply to 'bodily injury,' 'property damage' or 'personal injury' **due to the rendering of or failure to render** any professional service."[7]  *See* UAIG 424-431 - Exhibit C (emphasis added).

20.     The policy does not define the term  "professional service."  *Id.*

21.     In its denial letter, DS stated that this exclusion applied because the Whitney lawsuit "clearly **arises out of** the Professional Services rendered by Quest Youth Services, LLC[.]"  *Id.* (emphasis added).

22.     The "arises out of" language cited by DS for its denial is not found in its exclusion. *Id.* at UAIG 37.

23.     DS did not cite to any other basis for denying CGL coverage.  *Id.* at UAIG 424-431.

---

[6] However, Quest was not served with the lawsuit until more than 60 days after the policy expired.  *See* Amended Complaint - Exhibit B.  Also, Quest and Kaufusi contend that they did report the claim during the coverage period.  For the purposes of this motion for summary judgement only, Plaintiffs will not contest DS' claim that it was not informed of the claim until after the policy reporting deadline.

[7] Hereinafter, this provision is referred to as  "the professional services exclusion."

**Resulting Harm to Quest**

24.   When DS refused to defend the Whitney lawsuit, Quest and Kaufusi retained their own counsel.  *Id.* at UAIG 462-463.

25.   After some discovery, the Court ordered mediation.  *See* P 26 - Exhibit A.

26.   Whitney's counsel invited DS to mediation and asked DS to reconsider its denial of coverage.  *Id.* at P 60.

27.   After receiving this request, DS' claims manager told DS' claims adjuster that "the bad news is the duty to defend is a fiduciary duty in Utah, making the failure to defend per se bad faith if we are wrong."  *See* UAIG 11111 - Exhibit C.

28.   Quest's lawyer also asked DS to reconsider coverage and participate in negotiations, and explained the following:

> This lawsuit, and your position that there is no coverage, has had an extremely detrimental impact on my client, financially and otherwise, and they now face substantial risk and exposure as this case proceeds.  My clients' ability to adequately defend this case is significantly hampered by their extremely limited resources, which presents the very real possibility that my clients could be forced into bankruptcy . . . This requires them to consider any reasonable alternatives available to resolve this matter to avoid potentially devastating financial consequences . . . We hereby repeat our demand that you accept coverage on the claims . . . If you fail to do so, we will have no alternative but to address some kind of settlement with plaintiff and the State of Utah in order to protect my clients.  We urge you to participate in settlement discussions.

*Id.* at UAIG 462-463.

29.   Nevertheless, DS never stepped in to defend Quest.  *Id.* at UAIG 458-459.

30.   Quest and Kaufusi eventually ran out of money to pay their defense lawyer, who withdrew as defense counsel. *Id.*

31.   In October, 2010, Whitney and Plaintiffs agreed to arbitrate the Whitney claim. *Id.* at P 317-323.

32.   As arbitrator, Whitney and Plaintiffs selected Barbara Barrett, an experienced insurance defense litigator. *Id.*

33.   Counsel for Whitney and counsel for Quest presented relevant information via proffer, witness testimony and submission of documents, and asked Berrett to issue a decision. *Id.*

34.   The arbitrator issued a seven page arbitration ruling and found that "during the three days that Dillon was missing Quest . . . failed to notify law enforcement of the fact that Dillon was AWOL[.]" *Id.*

35.   The arbitrator concluded that Quest breached its duty of care by failing to "initiate action with local law enforcement to find Dillon[.]" *Id.*

36.   The arbitrator awarded $1,900,000 in damages to Whitney. *Id.*

37.   Plaintiffs and Whitney subsequently entered a settlement agreement, whereby they agreed that judgment could be entered against Quest in the amount of $1,900,000. Under this agreement, Whitney agreed to submit a claim against Kaufusi as a creditor in Kaufusi's bankruptcy action, and Quest and Kaufusi agreed to pursue this insurance action to recover the damages and pay them to satisfy the Quest Judgement, subject to the approval of the Kaufusi bankruptcy trustee *Id.* at P 7-12.

38.   Thereafter, a judgment was entered against Quest in favor of Whitney in the amount of $1.9 million. *Id.* at P 307-308.

### DS Improperly Applied the Claims Made Exclusion

39.   In 1985, the Utah Legislature enacted Utah Code Ann. § 31A-22-204, which provides: "No insurer may limit coverage under a policy insuring against legal liability to claims that are first made against the insured while the policy is in force, unless the policy contains on the cover page, a conspicuous statement that the coverage of the policy is limited in that way."

43.   In discovery DS provided a certified copy of its policy.  *See* UAIG 1-110 - Exhibit C.

44.   The cover page of the policy contains no disclosure, conspicuous or otherwise, that coverage is limited to claims made or reported while the policy is in force.  *Id.* at UAIG 2.

45.   At DS' Rule 30(b)(6) deposition, DS' designated witness testified that page UAIG 2 is in fact the "cover page" of the DS policy.

> Q.   And the page, the second page of that exhibit, UAIG00002, that's the cover page for this policy?
> A.   That's correct.

*See* Deposition of Veronica Buck at 66 (all cited portions of this depositions are attached as Exhibit E).

46.   The language notifying the insured of the claims made exclusion in found on the 48th page of the 109 page policy.  *See* UAIG 47 and 424-431 - Exhibit C.

47.   In 1996, the Utah Insurance Commission issued the following bulletin to insurers:

> This bulletin is issued for the purpose of informing all insurers licensed and authorized to write general liability insurance coverage in this state of the requirements of Utah law for disclosure upon 'claims made' liability policy forms. Utah Code Ann. § 31A-22-204 sets forth the following restrictions on insurers

issuing policies providing liability coverages which are limited to claims made within the policy period.  It states: [statute quoted].  All liability insurers utilizing a 'claims made' policy form in this state are required to make the appropriate disclosure **on the policy declarations page or policy jacket** that coverage is limited to claims first made during the policy period.  Failure to comply with the statute is a violation of Utah insurance Code. . . .(emph. Added)

*See* Bulletin - Exhibit F.

48.   According to the policy's Schedule of Forms and Endorsements, the "Policy Jacket" is UAIG

2.  *See* UAIG 3 - Exhibit C

49.   The schedule states that the "Policy Declarations" is the third page of the policy.  *Id.* at UAIG

3-4.

50.   Just like the cover page and jacket, the Policy Declarations contains no "conspicuous

statement" disclosing the claims made exclusion.  *Id.* at UAIG 4.

51.   DS' 30(b)(6) corporate witness admitted that the policy cover page, policy jacket and policy

declarations do not contain a conspicuous disclosure of the "claims made" reporting

requirements.  *See* Buck Depo. at 39-41 - Exhibit E.

52.   In 1985, the Utah Legislature enacted Utah Code Ann. §31A-21-312, which provides:

"Failure to give notice or file proof of loss [as required by a policy] does not bar recovery

under the policy if the insurer fails to show it was prejudiced by the failure."

54.   DS has not and does not claim it was prejudiced by Quest's alleged failure to timely report

Dillon's death.  *See* Mawby Depo. at 123 - Exhibit D.

**DS Improperly Applied the Professional Services Exclusion**

53.    The professional services  exclusion disclaims coverage for injury "due to" the rendering of

or failure to render professional services.  *See* UAIG 37 - Exhibit C.

54. DS knew that if there was any act or omission complained of in the lawsuit that was not a professional service, it had to provide CGL coverage.  *See* Mawby Depo. at 92 - Exhibit D.

55. In deciding whether the professional services exclusion applied to the Whitney lawsuit, DS knew that it had to look at the specific acts or omissions complained of in the Complaint. *Id.* at 91.

56. The DS adjuster who denied coverage, Cheryl Mawby, admitted at her deposition that one act or omission complained of by Whitney in the complaint was Quest's "failure to make phone calls."  *Id.* at 96.

57. Mawby admitted that making phone calls does not require any professional training and is something anyone could do, whether trained or not.  *Id.* at 96-97.

58. Mawby admitted that in deciding coverage, she had to resolve all doubts regarding the existence of coverage in favor of Quest.  *Id.* at 29 and 40.

59. Mawby admitted that she had to interpret exclusions narrowly and strictly against DS.  *Id.* at 39-40 and 46.

60. Mawby admitted that if there was more than one plausible meaning of "professional services," and one meaning would lead to coverage, she had to adopt that meaning and provide coverage.  *Id.* at 41.

61. Mawby admitted that DS has the burden to prove the applicability of the exclusion.  *Id.* at 44-47.

13

## SUMMARY JUDGMENT STANDARD

A motion for summary judgement shall be granted when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c)(2).   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (U.S.Dist.Col. 1986).   "[A]n opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must - by affidavits or as otherwise provided in [rule 56] - set out specific facts showing a genuine issue for trial."  Federal Rule of Civil Procedure 56(e)(2).

## ARGUMENT

### I.   DS BREACHED THE INSURANCE CONTRACT BY DENYING PL COVERAGE BASED ON THE CLAIMS MADE EXCLUSION BECAUSE IT VIOLATES A UTAH INSURANCE STATUTE.

DS denied PL coverage based solely on the claims made exclusion.  However, Utah Code Ann. §31A-22-204 requires insurers to include a "conspicuous" display of the "claims made" requirement on the cover page of the policy; otherwise they may not exclude coverage based on this requirement.  The cover page of the DS policy contains no such disclosure. Therefore, DS' claims made exclusion is invalid and, DS breached its contractual duty to defend Quest by denying PL coverage.

In Utah, an insurance exclusion that violates a insurance statute cannot be relied upon to deny coverage.  *See Cullum v. Farmers Ins. Exchange*, 857 P.2d 922 (Utah 1993) (reversing trial court for granting summary judgment for insurer because exclusion relied on by insurer violated a Utah

statute); and *General Security Indem. Co. of Arizona v. Tipton*, 158 P.3d 1121 (Utah App. 2007) (remanding for entry of judgment in favor of insured because exclusion relied on by insurer violated Utah statute).

In its entirety, Utah Code Ann. § 31A-22-204 provides:  "No insurer may limit coverage under a policy insuring against legal liability to claims that are first made against the insured while the policy is in force, unless the policy contains on the cover page, a conspicuous statement that the coverage of the policy is limited in that way."  To interpret this statute, the Court must look "first and foremost to the statute's plain language." *Peterson & Simpson v. IHC Health Services, Inc.*, 217 P.3d 716, 720 (Utah 2009) (citation omitted).  The Court can consider "other sources only if the plain language of the statute is ambiguous." *Id.*  The Court need not look beyond the plain language of Utah Code Ann. § 31A-22-204 to determine its meaning because the statute is unambiguous.

The term "cover page" is self explanatory. This Court should find that DS' policy violates Utah Code Ann. §31A-22-204.  However, should the Court find that the  the term "cover page" is not self explanatory, the Utah Insurance Commission issued a Bulletin to insurers in 1996 on this very subject.[8]   The Bulletin states that the required disclosure had to appear on the "policy declarations page or policy jacket." *See* Bulletin - Exhibit F.  Neither the declarations page nor the policy jacket contain the required "conspicuous" disclosure. That should settle the question.

Moreover, courts around the country strictly enforce statutes that require insurers to provide

---

[8]   *See Metropolitan Property and Cas. Ins. Co. v. Blue Cross and Blue*, 885 N.E.2d 825 (Mass. 2008) (holding insurance commission bulletins, while not binding, are "useful . . . to interpret ambiguous statutory provisions relevant to the agency's area of expertise"); and *Kimbrell v. Great American Ins. Co.*, 420 So.2d 1086, 1088 (Fla. 1982) ("when the language of a statute is plain and its meaning clear, resort to" insurance commission bulletin "is unnecessary").

specific notices at specific locations in a policy.  In fact, there is a closely analogous precedent from this Court, *Johnson v. Life Investors Ins. Co. of America*, 216 F.3d 1087 (10th Cir. 2000) (unpublished).[9]

In *Johnson*, the 10th Circuit, applying Utah law, affirmed the Court's decision to grant summary judgment in favor of the insured where the insurer failed to provide a conspicuous disclosure of limitations to coverage on the cover page, in violation of a Utah Insurance Regulation. There, the plaintiff's husband became sick, fell down the stairs and died.  The plaintiff's life insurer denied coverage because the policy excluded coverage for death caused by sickness. Utah Administrative Code R590-126 required that "accident-only policies shall contain a prominent statement on the first page of the policy, or attached thereto, in either contrasting color or in boldface type at least equal to the size of type used for policy captions, as follows: 'This is an accident-only policy, and it does not pay benefits for loss from sickness."  *Id.* at 3.  The trial Court granted summary judgment in favor of the insured because the exclusion did not appear on the first page nor was it made in color or bold type.

The 10th Circuit affirmed the decision because the insurer "violated Utah's disclosure regulation by burying the disclosure in the policy and not setting it out in bold or colored type."  *Id.* at 4, FN4.  *See* also *Montana Petroleum Tank Release Compensation Bd. v. Crumleys, Inc.*, 174 P.3d 948 (Mont. 2008) (holding insurance provision requiring insured to give insurer notice of loss within 120 hours was invalid because "failure to highlight the 120-hour notice provision in a table of contents or notice section is clear violation of [statute]").

---

[9] All unpublished decisions cited herein are attached as Exhibit G.

DS cannot successfully argue that placing the exclusion somewhere other than on the cover page satisfies the statute.  This improperly ignores the fact that the statute uses the term "cover page."  *See General Security*, 158 P.3d at 1126  (courts must "presume the legislature used each term advisedly") (citation, brackets and quotation omitted).  Ruling that DS complied with the section 31A-22-204 would require the Court to ignore the plain language of the statute.  *See Cullum*, 857 P.2d at 926 (rejecting insurer's argument because "we cannot simply ignore the plain language of" the insurance code).

If placing the exclusion somewhere else was sufficient, the statute would have said so. Allowing an insurer to comply with the statute by simply displaying the exclusion "somewhere" in the policy would improperly render the statute meaningless because the exclusion will always be displayed "somewhere" in the policy.  *See General Security*, 158 P.3d at 1126 ("we avoid interpretations that will render portions of a statute superfluous or inoperative") (citation and quotation omitted).

The obvious purpose of the statute was to provide a clear and prominent reminder to the insured, each time he/she looks at the policy, that all claims must be reported during the reporting period set forth in the policy.  Putting this disclosure on the cover page ensures that the insured will see the claims made exclusion even if he does not read all 109 pages.  Requiring that the disclosure be "conspicuous" ensures that the insured notices the exclusion even if he/she is just scanning the policy.

Should DS argue that  the term "cover page" refers to something other than the page on the cover of the policy, the Court need only look to the deposition of DS' own 30(b)(6) witness to find

to the contrary.  DS' 30(b)(6) witness testified that UAIG 2 is the cover page and agreed the cover page says nothing about the claims made exclusion.  See Buck Depo. at 39-40 and 66 - Exhibit E.

Other Courts have rejected the insurer's argument that it can enforce a policy exclusion when its policy "almost" puts the notice to the insured in the place designated by statute.  For instance, in *Northern Ins. Co. of New York v. Hiers*, 504 So.2d 1382 (Fla.App. 5 Dist. 1987), the insurer argued that it substantially complied with the required statutory disclosure because the required form was provided in the same envelope as the notice of premium and was stapled to the notice of premium.  However, the trial court rejected the insurer's argument.  The court of appeals affirmed summary judgment because the form was under the policy jacket, not on the jacket.  The court reasoned as follows:

> It is apparent that the legislature intended the notification to be read by the insured in order to provide him another opportunity to obtain uninsured motorist coverage. It is also apparent that it was not intended by the legislature that the form notification be buried within the policy itself.

*Id.* at 1384.

Consistent with the foregoing authorities, the claims made exclusion is invalid and DS cannot rely on it to deny coverage.  Because DS improperly denied coverage, it breached the insurance contract.

## II.   DS BREACHED THE INSURANCE CONTRACT BY DENYING PL COVERAGE BASED ON THE CLAIMS MADE EXCLUSION BECAUSE DS SUFFERED NO PREJUDICE AS A RESULT OF ANY LATE REPORTING.

Even if DS could somehow  persuade the Court that it complied with the "cover page" disclosure required by Utah Code Ann. 31A-22-204, DS would still be required to defend and pay the claim tendered under the PL coverage . Utah Code Ann. §31A-21-312(2) states that "[f]ailure

to give notice or file proof of loss [within the time specified in the policy] does not bar recovery under the policy if the insurer fails to show it was prejudiced by the failure." *See also State Farm Mutual Auto. Ins. Co. v. Green*, 89 P.3d 97, 104 (2003) (holding insurer must show "actual" rather than "theoretical" prejudice to deny coverage based on technical policy breaches like the failure to provide timely notice of a claim).

In the instant case, DS breached its duty to provide PL coverage based on Quest's alleged failure to report the claim within the reporting deadline because DS made no claim that it was prejudiced by the alleged untimely notice.   At her deposition,  DS' adjuster admitted that DS has never claimed and does not currently claim prejudice.  *See* Mawby Depo. at 123 - Exhibit D.

DS may argue that section 31A-21-312 does not apply to the PL portion of the policy because Utah Code Ann. §31A-22-203 states the following: "Section §31A-21-312 may not be construed to extend the normal provisions of any claims-made coverage that required notice of an occurrence or claim prior to the expiration of the policy for coverage to be in force."  This argument ignores that the DS policy does not require reporting  "prior to the expiration" of the policy. *Id.* (emphasis added).  Instead, the PL portion of the policy gave Quest 60 days after expiration of the policy to report the claim.  Thus, section 31A-21-312 does not apply and DS cannot avoid its coverage obligations by relying upon this statute.

III.   DS BREACHED THE INSURANCE CONTRACT BY DENYING CGL COVERAGE BASED ON THE PROFESSIONAL SERVICES EXCLUSION

Even assuming, for argument sake,  that DS could persuade the Court that it did was not obligated to defend plaintiffs  under the PL portion of the policy, it would still lose on summary judgement  because it also owed a defense to plaintiffs  under the CGL portion of the policy.

DS does not dispute that the insuring agreement in the CGL portion of the policy includes coverage for the Whitney claim against Quest and Kaufusi.  However, DS denied coverage under an endorsement to the policy that contains a professional services exclusion.  The exclusion in question precludes coverage for injury "due to the rendering or failure to render any professional service."  *See* UAIG 37 - Exhibit C.  The Whitney plaintiffs alleged negligence based on, among other things, failure to make phone calls to notify the authorities that Dillon Whitney was AWOL.  The failure to make such phone calls is a clerical act and not a "professional service," as that term is defined in the relevant cases.  Plaintiffs are therefore entitled to summary judgement and a declaration that DS owed defense and coverage under the CGL portion of the policy.  It was improper for Quest to deny coverage by citing to this exclusion.

Under Utah law, insurance contract exclusions must be narrowly and strictly construed against the insurer.  *See LDS Hosp., a Div. of Intermountain Health Care, Inc. v. Capitol Life Insurance Company*, 765 P.2d 857 (Utah 1988).  An insurer has the burden of showing the applicability of exclusions and conditions that preclude coverage.  *Id.*

In Utah, courts "examine the language of the policy and compare it to the allegations made in a complaint to ascertain the scope of coverage provided by the policy."  *Equine Assisted Growth and Learning Ass'n v. Carolina Cas. Ins. Co.*, 266 P.3d 733, 737 (Utah 2011).  In examining the complaint and the policy, courts in Utah look at the specific allegations in the complaint.  *See e.g., Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210 (Utah 2006).

"[A]mbiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage."  *Farmers Ins. Exchange v.*

*Versaw*, 99 P.3d 796, 800 (Utah 2004) (citation and quotations omitted).

Coverage is "triggered whenever 'the insurer ascertains facts giving rise to potential liability under the insurance policy.'" *Equine*, 266 P.3d at 736 (citation and quotations omitted). "[W]hen there are covered and non-covered claims in the same lawsuit, the insurer is obligated to provide a defense to the entire suit, at least until it can limit the suit to those claims outside of the policy coverage." *Benjamin*, 140 P.3d at 1216 (Utah 2006) (quoting *Appleman on Insurance Law and Practice* § 136.2[D] (2d ed.2006).

The Utah Supreme Court has not been called upon to decide the definition of "professional services," as the term is used in the subject policy exclusion. However, the prevailing rule in jurisdictions throughout the United States is that "professional services," as the term is used in the exclusion, are "[a]cts or services involving specialized knowledge, labor or skill which is predominantly mental or intellectual rather than physical or manual."[10] To determine whether conduct fits the definition, courts examine "the character of the" conduct, "such as whether special knowledge and technical expertise are required, rather than the title or character of the party

---

[10] *Chapman ex rel. Chapman v. Mutual Service Cas. Ins. Co.*, 35 F.Supp.2d 693, 697 E.D.Wis.,1999); *Feszchak v. Pawtucket Mut. Ins. Co.*, 316 Fed.Appx. 181 (3d Cir. 2009); *Food Pro Intern., Inc. v. Farmers Ins. Exchange*, 169 Cal.App.4th 976 (Cal.App. 6 Dist. 2008); and Tarron L. Gartner, *The CGL Professional Services Exclusion versus the Professional Liability Policy (255)*, International Risk Management Institute, Inc., (May 4, 2004) <https://plusweb.org/files/Events/Professional%20Liab%20BO%20%20PD%20Gaps.pdf>. While "professional services" may be susceptible to other definitions, it is certainly susceptible to the definition employed by these courts. All Quest must do to merit coverage is show the term is "fairly susceptible" to this definition and that the exclusion does not apply when this definition is employed. *See Farmers Ins. Exchange v. Versaw*, 99 P.3d 796, 800 (Utah 2004).

performing the services."[11] Failing to make phone calls to report a missing child is a clerical act, not requiring specialized skill, training or knowledge. This is a clerical act which requires simple common sense and follow through. Thus, Dillon did not die "due to" Quest failing to render "professional services."

Other courts have reached the same conclusion when analyzing the professional service exclusion under similar facts. *See Merchants Mut. Ins. Co. v. City of Concord*, 374 A.2d 945 (N.H. 1977) (holding professional service exclusion did not apply to insured police department's negligent failure to call a judge and inform him that an inmate was acting in a way that might cause harm to himself); and *Scottsdale Ins. Co. v. Lock Towns Community Mental Health Center, Inc*., 442 F.Supp.2d 1287 (S.D.Fla. 2006) (holding exclusion did not apply to insured mental health facility's negligent failure to keep patient safe).

Courts from other jurisdictions have even reached the same conclusion even where the pleadings and policy presented a closer call than they do under the facts of this case.[12]

---

[11] *Cochran v. B.J. Services Co. USA*, 302 F.3d 499 (5th Cir. 2002); Gartner, *supra* note 10; and Thomas M. Bower, *What are "Professional Services"?*, Shaub Ahmuty Citrin & Spratt LLP (2002) <http://www.sacslaw.com/CM/Articles/Articles18.asp>.

[12] *See Feszchak v. Pawtucket Mut. Ins. Co.*, 316 Fed.Appx. 181 (3d Cir. 2009) (professional service exclusion did not apply to claim against hospital that it failed to maintain stationary bike used by patients); *Aerothrust Corp. v. Granada Ins. Co.*, 904 So.2d 470 (Fla.App. 3 Dist. 2005) (exclusion did not apply to insured's negligent inspection of hoist even though the policy defined professional services as including inspection services because inspection did not require specialized training, education or experience); *Scottsdale Indem. Co. v. Hartford Cas. Ins. Co.*, 2008 WL 131105 (E.D.Pa. 2008) (unpublished) (holding exclusion did not apply to insured's negligent safety inspection even though professional service exclusion was defined as including inspections because inspector had only taken two classes for six to eight weeks and only had two years experience); *Cochran*, 302 F.3d at 499 (holding exclusion did not apply to insured's negligent supervision of drilling activities even though exclusion used the term "arising out of" and defined professional services as including supervisory activities because supservisor

Moreover, DS drafted the professional services endorsement contained in the policy, and ambiguity on this point is resolved against the drafter.  This means that, at best, DS can argue that it is ambiguous whether the acts complained of in the complaint are "due to" the rendering or failure to render professional services.  Since at best this is ambiguous, DS was obligated to provide a defense.

In its initial denial letter DS's, adjuster told the insured Quest's position was justified because, it claimed,  the Whitney lawsuit "arises out of" Quest professional services. But, not only does the case law  hold differently, it is revealing that DS even failed to quote the language of its own policy  endorsement accurately.  The DS endorsement  precludes coverage only where injury is **"due to"** the rendering or failure to render professional service.  It is significant that  DS used the term **"due to"** professional acts, rather than the term **"arising out of"** professional acts.  The term "due to," when used in an insurance policy exclusion, is much narrower than is the term  "arising out of."  DS' own adjuster admitted this in her deposition.[13]  The conclusion is: DS' professional

---

only had high school education and the operation supervised did not require technical instruction or skill); *State, Dept. of Transp. and Public Facilities v. State Farm Fire and Casualty Company*, 939 P.2d 788 (Alaska 1997) (holding exclusion did not apply to airport's negligent operation of baggage train); and *First Specialty Ins. Corp. v. Maine Coast Marine Const., Inc*., 497 F.Supp.2d 11 (D.Me. 2007) (holding exclusion did not apply to incident in which insured marine construction company negligently crashed boat into plaintiff's property).

[13] *See* also *Utica Nat. Ins. Co. of Texas v. American Indem. Co.*, 141 S.W.3d 198 (Tex. 2004) (holding the term "due to" in professional service exclusion is narrower than the term "arising out of," which insurer used in other exclusions, because the latter simply requires a "a causal connection or relation" and the former "requires a more direct type of causation that could tie the insured's liability to the manner in which the services were performed"); and *Lady Beautiful, Inc. v. Zurich Ins. Co.*, 240 N.E.2d 894 (Ohio Com.Pl. 1968) (holding exclusion did not apply to incident where insured beauty salon's hair dryer burned customer because although injury occurred during a professional service, it did not occur due to a professional service).

services exclusion must be read narrowly.  Failing to make phone calls is not clearly an excluded act.

Despite this, the CGL policy was interpreted by DS incorrectly and in a self serving way to deny coverage that it properly owed Quest and Kaufusi.  It is settled law that where there are two possible interpretations of a policy term, coverage must be provided if any reasonable definition of the term would result in coverage.  *See Northrop v. Allstate Ins. Co.*, 720 A.2d 879 (Conn. 1998).  Even if DS can argue that it is plausible to define "professional services" differently that the majority of case authorities cited above, it does not help avoid summary judgement.  DS drafted the policy and could have defined "professional services" to exclude coverage for routine clerical or ministerial acts, but it did not.

## IV.   THE COURT SHOULD RULE THAT DS IS BOUND BY THE SETTLEMENT BETWEEN QUEST AND WHITNEY AND THE JUDGMENT ENTERED AGAINST QUEST

An insurer who improperly abandons its insured is bound by a settlement or stipulated judgment between the insured and plaintiff, unless the insurer can show the settlement was collusive or entered in bad faith.  DS abandoned Quest without basis.  DS had plenty of chances to step in and defend Quest.  Quest did what it had to do and entered a settlement with Whitney.

"[W]hen an insurer, whose policy requires it to defend its insured, receives notice of a suit against the insured and is allowed an opportunity to defend, but refuses, the insurer is bound by the findings and judgment therein."  *Speros v. Fricke*, 98 P.3d 28, 39 (Utah 2004) (citation, quotations and brackets omitted) (holding insurer could not re-litigate injured party's claim after default had been entered because when insurer "chose not to defend [insured], it forfeited its opportunity to dispute the underlying facts of the accident").

24

The same is true when litigation against the uninsured results in settlement rather than a judgment. *See Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210 (Utah 2006). In *Benjamin*, the insured was sued and the insurer refused to defend him. As a result, he settled the plaintiffs' claims and sued his insurer for damages. The trial court granted summary judgment for the insured and the insurer appealed. The Supreme Court affirmed and ruled that the insurer had to indemnify the insured for what he paid in the settlement. The Supreme Court reasoned as follows:

> Benjamin entered into settlement discussions with [plaintiffs] in an attempt to limit his potential exposure. While [insurer] was contractually entitled to participate in and control such discussions, it declined to do so, electing instead to gamble on the possibility that it could avoid any obligation for the claims altogether. As a result, [insurer] is now estopped from second-guessing Benjamin's decision to settle

*Id.* at 1216; *see* also *Losser v. Atlanta Intern. Ins. Co.*, 615 F.Supp. 58, 61 (D.C.Utah 1985) ("We join with other courts that have reviewed this issue in holding that where, as here, the insurer refuses to defend on a claim against the policy, and the insured enters into a good faith agreement not deemed to be in the best interests of the insurer, the insurer has assumed the risk that it may be bound to the terms of the agreement").

An insurer who loses a coverage dispute after having abandoned its insured can only avoid paying a settlement or stipulated judgment in the underlying case by showing the settlement was collusive or entered in bad faith. *See Losser*, 615 F.Supp. at 61; and *Utah Power & Light Co. v. Federal Ins. Co.*, 711 F.Supp. 1544, 1549 (D.Utah 1989) ("However, an insurer that abandons the defense of its insured is bound by and may not contest the terms of a settlement agreed to by the insured unless the agreement should be entered in bad faith or be unconscionable on its face").

Here, DS has no basis to argue that the process which led to entry of judgement was collusive

or evinced bad faith.  Donna Whitney's counsel valued the claim on $6,000,000 to $7,000,000 based on jury verdict research and opinions from independent lawyers.  *See* Deposition of Robert Strieper at 28-29, 32-33, 43-44 - Exhibit H.  Quest's counsel contested the valuation.  *Id.*  Rather than pay Whitney's demand, Quest and Kaufusi agreed to arbitrate the case.  Rather that merely submit evidence of Quest's exposure in a motion to the court, Quest and Whitney hired Barbara Berrett, a neutral arbitrator (who is primarily a defense lawyer) to determine Quest's exposure.  Rather than allow one party to submit a number to the judge for approval, Quest and Whitney allowed the arbitrator to decide based on evidence.  *See* P 317-323 - Exhibit A; *see* also *Feszchak*, 316 Fed.Appx. at 2 (holding trial court properly enforced settlement in underlying case notwithstanding insurer's defense of bad faith and insurer's expert who opined settlement was entered in bad faith because "the partes settled for the amount awarded by an arbitrator during nonbinding arbitration" and the "court that approved the settlement found that it was 'not unreasonable under the circumstances presented by the evidence'").

On at least two prior occasions, the Court has analyzed similar settlements and ruled as a matter of law that there was no bad faith or collusion.  For example, in *Losser*, the injured plaintiff sued the insured and the insurer refused to defend.  The insured and the plaintiff entered a settlement, whereby a stipulated judgment would be entered against the insured, the plaintiff would not execute the judgment against the insured and the plaintiff would pursue the insurer.  The Court ruled that the insurer's denial of coverage was improper.  The insurer argued that it should not be bound by the settlement agreement.  The Court rejected this argument because the situation showed "no evidence of collusion or bad faith," the "agreement [was] not on its face unconscionable" and the insurer "had

every opportunity if it so chose to take steps to protect its interests in th[e] matter." *Id.* at 61.

The Court reached the same conclusion in *Utah Power & Light Company v. Federal Insurance Company*, 711 F.Supp. 1544 (D. Utah 1989). There, the insurer defended the insured in a wrongful death action under a reservation of rights. However, once attorneys fees neared the policy limits, the insurer tendered its policy limits to the insured and indicated that it would not continue to pay defense costs. The insured rejected this offer because excess carriers were not yet willing to pay for a settlement or defense costs. Accordingly, the insured settled with the plaintiffs and sued its insurers.

The insured moved for summary judgment, requiring its insurer to contribute its limits to the settlement. The insurer argued that it could not be bound by the settlement. The Court rejected this argument and held the insurer was bound because the insurer "abandoned the defense" and failed to meet "its burden to show [insured] acted in bad faith." *Id.* at 1554.

DS may argue that it should be allowed to challenge whether the settlement is reasonable. In *Losser* and *Utah Power & Light*, the Court did not list "reasonableness" as an available defense when the insurer has improperly refused to defend. Moreover, when the excess insurance carrier in *Utah Power & Light* appealed and argued that it should be allowed to contest the reasonableness of the settlement, the 10th Circuit affirmed the Court's decision. *See Utah Power & Light Co. v. Federal Ins. Co.*, 983 F.2d 1549 (10th Cir. 1993).

In the instant case, DS is bound by the settlement agreement and stipulated judgment because it abandoned Quest after many opportunities to defend Quest. Quest tendered the case to DS shortly after being sued. Whitney's counsel asked DS to reconsider its coverage position and invited DS

to mediation.  Quest's counsel explained to DS the horrible financial effect the Whitney case was having on Quest and informed DS that Quest may have to enter some kind of settlement with Whitney to protect its assets.  Nevertheless, DS failed to defend Quest.

DS was well aware that if it chose to deny coverage it was "rolling the dice."  Indeed, about a week before Quest's counsel asked DS to reconsider coverage, DS researched Utah law and learned that "the bad news is the duty to defend is a fiduciary duty in Utah, making the failure to defend per se bad faith if [DS is] wrong."  *See* UAIG 11111 - Exhibit C.

The above cited cases are supported by good reason.  It makes no sense to allow DS to argue that Quest should have settled for less, defended harder or rolled the dice at trial.  DS had the chance to make these calls, but declined.  Quest had no money for a cash settlement, trial or lengthy defense. DS cannot argue that "someone" should have gotten a better deal for Quest because that "someone" was the insurer, DS.

## CONCLUSION

Based on the foregoing, the Court should grant summary judgment on Plaintiffs' breach of contract claim against DS and rule that DS is bound by the Quest/Whitney settlement and the judgment against Quest.

DATED this 13th day of March 2012.

EISENBERG GILCHRIST & CUTT

/s/   Jeffrey D. Eisenberg
Jeffrey D. Eisenberg
Eric S. Olson
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

On this 13th day of March 2012, the undersigned certifies that a copy of the foregoing

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY**

**JUDGMENT** was sent via CM/ECF to the following:

Stanford P. Fitts
STRONG & HANNI
3 Triad Center, Suite 500
Salt Lake City, UT 84180
*Attorneys for Bank of the West, Inc. and*
*BW Insurance Agency*

Gary L. Johnson
Tanya N. Lewis
RICHARDS BRANDT MILLER NELSON
299 South Main Street, Suite 1500
Salt Lake City, UT   84110-2465
*Attorneys for UnitedAmerica Insurance*
*Group & Diamond State Insurance Company*

    /s/   Cheryl Mattson